**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| VIDEOAMP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff"), for its Complaint against Defendant VideoAmp, Inc. ("VideoAmp" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement brought against Defendant VideoAmp for infringement of United States Patent Nos. 11,871,058 ("the '058 Patent") and 11,856,250 ("the '250 Patent") (collectively "the Patents").

## PARTIES

2.      Plaintiff The Nielsen Company (US), LLC ("Nielsen") is organized and exists under the laws of the State of Delaware.

3.      According to public records, VideoAmp, Inc. ("VideoAmp") is incorporated in Delaware and is headquartered in Los Angeles, California.

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the Patent Act, 35 U.S.C. §§ 1 *et seq.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over Defendant VideoAmp because Defendant is a Delaware corporation, and on information and belief, regularly transacts business in Delaware. Defendant has a registered agent in Delaware: The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

6.     Venue is proper pursuant to 28 U.S.C. § 1400(b) because Defendant resides in this District.

## FACTUAL BACKGROUND

7.     Founded in 1923 by Arthur C. Nielsen, Nielsen is the media industry's leading data and analytics company. Nielsen fuels the industry by providing an accurate understanding of the media that people consume.

8.     Measuring across all channels and platforms–from traditional linear television to streaming TV to social media and on-line video/audio platforms–Nielsen helps its clients and partners optimize the value of their marketing investments and growth strategies. Nielsen offers measurement and analytics services in nearly 50 countries.

9.     Nielsen is a leading innovator in the field of audience measurement and has received numerous patents for its inventions in the field, including the patents-in-suit. Nielsen's audience measurement innovations have been a key to enabling its industry-leading measurement and analytics products and services. Nielsen has invested millions of dollars in its audience measurement inventions.

10.     The media industry considers Nielsen's data to be the gold standard for reporting who is watching what media and uses Nielsen's data for buying and selling advertising. Much of the industry considers Nielsen's data to be a "currency" that ad buyers and sellers use to negotiate price and volume of advertisements. For example, ad buyers such as advertisers and

their agencies may want to comparably measure their campaigns across publishers or distribution channels and negotiate their media buys on the same terms. Ad sellers, such as television networks, cable distributors, and publishers, also want to transact on a common currency. Using Nielsen's metrics as a "currency" therefore reduces financial risk and promotes competition.

11.     One of the unique features of Nielsen's products and services is their leveraging of panel measurement technologies. Nielsen uses panel data to understand consumer behavior and to generate person-level data. Nielsen's panel data provides an accurate picture of how consumers engage with media.

12.     Even with media consumption data from set-top boxes, smart TVs, streaming platforms, and other sources (collectively, "big data"), panels are still important. Big data provides device-level data and identifies what is playing but does not identify who, if anyone, is watching that screen or even if the screen is on or displaying a particular content source. Big data alone cannot tell whether a show or a movie is playing to an empty room or to a television that is off, and advertisers do not want to pay for media without an audience.

13.     In addition, big data is not representative of the full media audience. A cable company might have tens of millions of subscribers, but those viewers do not all pay for the same channels or watch the same programs. Without the ability to identify viewers and their demographic profiles, research companies that rely exclusively on big data cannot de-duplicate audiences across platforms, devices, and services, leaving them no ability to ascribe who is watching the media or their characteristics.

14.     A cornerstone of Nielsen's media data and analytics business has been its investment in media panels and related technology, including technology to obtain data and to analyze data collected from these panels. Nielsen's media panels consist of people who have

allowed Nielsen into their homes to enable first-hand measurement, via audience measurement devices, of their media consumption activities on an ongoing basis. A panel, created with the right attention to detail and an understanding of statistics, provides the best way to represent the general population and to provide reliable estimates of audience composition in today's diverse media ecosystem. These media panels allow for a true understanding of not just who is consuming media, but also when, why, where, and how much–a truth set.

15.      For years, Nielsen's panels have been the gold standard for television measurement, and its panels remain integral to providing critical insight into audiences that big data alone cannot provide. Big data datasets offer value in that they provide exponentially larger audience sizes than traditional panels, but they lack specific information about the audience. Big data's scale makes it possible to analyze media usage with more granularity, and with the right calibration and people-based modeling in place, big datasets can offer valuable insights for long-tail programming and hard-to-reach audiences. In order to be more holistic and representative, audience measurement can leverage big data in conjunction with data from panels or other sources, sometimes referred to as "commingling." Nielsen's patents at issue in this case relate to this innovation.

16.      Using Nielsen's patented technology, Defendant VideoAmp claims to have "becom[e] the leading modern media currency in the United States." (Ex. Q, https://videoamp.com/blog/a-letter-from-our-founder/.) VideoAmp "ha[s] gone live with most of the world's largest media companies: from Amazon, Disney, YouTube, Warner Bros. Discovery, Facebook/Instagram, NBCU, Paramount, Weather Channel, TelevisaUnivision, Hallmark and more." (*Id.*) According to VideoAmp's founder, Ross McCray, VideoAmp has "seen over 1,400% year over year growth of VideoAmp media currency transactions in 2023 and next year

looks even bigger. Over 1,000 advertisers have already booked billions of dollars of guarantees on our currency in 2024." (*Id.*) Other sources indicate that VideoAmp is being "used as a currency in $2 billion of TV deals in the past year." (Ex. R, https://adage.corn/article/measurement/videoamp-ceo-ross-mccray-steps-down-company-lays-20-staff/2535441.) Moreover, "VideoAmp has established itself as the primary rival to Nielsen in TV currency, offered as an option by the widest number of TV networks plus Amazon Prime and YouTube, and the only option from Byron Allen's Allen Media Group." (*Id.*)

## THE ASSERTED PATENTS

17.    The '058 Patent, entitled "Methods and Apparatus to Determine a Duration of Media Presentation Based on Tuning Session Duration," was duly and legally issued on January 9, 2024. A true and correct copy of the '058 Patent is attached hereto as Ex. A.

18.    The '058 Patent issued from U.S. Patent Application No. 17/898,185, which was filed on August 29, 2022, as a continuation of application No. 16/860,026, filed on April 27, 2020, now Pat. No. 11,432,026, which is a continuation of application No. 15/990,729, filed on May 28, 2018, now Pat. No. 10,638,177, which is a continuation of application No. 15/011,455, filed on January 29, 2016, now Pat. No. 9,986,272. In addition, the '058 Patent descends from Provisional Application No. 62/239,126, filed on Oct. 8, 2015. The '058 Patent's priority date is at least as early as January 29, 2016.

19.    Nielsen is the assignee and owner of all right, title, and interest in the '058 Patent. The '058 Patent is valid and enforceable.

20.    The '250 Patent, entitled "Methods and Apparatus to Determine a Duration of Media Presentation Based on Tuning Session Duration," was duly and legally issued on December 26, 2023. A true and correct copy of the '250 Patent is attached hereto as Ex. B.

21.     The '250 Patent issued from U.S. Patent Application No. 17/967,832, which was filed on October 17, 2022, as a continuation of application No. 16/860,026, filed on April 27, 2020, now Pat. No. 11,432,026, which is a continuation of application No. 15/990,729, filed on May 28, 2018, now Pat. No. 10,638,177, which is a continuation of application No. 15/011,455, filed on January 29, 2016, now Pat. No. 9,986,272. In addition, the '250 Patent descends from Provisional Application No. 62/239,126, filed on Oct. 8, 2015. The '250 Patent's priority date is at least as early as January 29, 2016.

22.     Nielsen is the assignee and owner of all right, title, and interest in the '250 Patent. The '250 Patent is valid and enforceable.

23.     The '058 Patent and the '250 Patent descend from the same parent application, Application No. 16/860,026. The specification of both Patents is substantively the same ("the Common Specification").

24.     The declaration of Virginia Lee ("Lee Decl."), attached hereto as Ex. C, is hereby incorporated by reference into this Complaint.

25.     The Patents are directed to, among other things, systems, methods, and apparatuses for improving audience measurement technology by collecting tuning session data from media output devices like set-top boxes (STBs) and presentation session data from panelist meters and other sources and by using models to more accurately determine audience viewing in households providing the tuning session data. Tuning session data provides the channel a device (*e.g.*, an STB) was tuned to and for how long. One notable problem with tuning session data is the phenomena of "phantom viewing." (Ex. C, Lee Decl., ¶ 9.) Phantom viewing occurs when tuning session data includes, for example, (1) periods when the STB was on but the corresponding television was not and/or (2) when the television was displaying content from

another source such as a DVD or Blu-Ray player. (*Id.*; *see e.g.*, Ex. A, '058 Patent, 2:48-3:14.) Phantom viewing occurs when the tuning session data does not accurately reflect actual media consumption (*e.g.*, a household's actual viewing of media presented by a television). (Ex. C, Lee Decl., ¶ 9.) Presentation session data, on the other hand, captures, *inter alia*, data about media consumption when the television is on and displaying media from a reported content source, such as a channel. Such data can come from any source that identifies when a television is on and displaying the reported content source. (*Id.*) Presentation session data more accurately reflects media consumption and does not have the above weaknesses of tuning session data. (*Id.*) But presentation session data is not available for all households that provide tuning session data. (*Id.*) This creates a problem: How to increase the usefulness and accuracy of the more abundant tuning data by determining the times during which its associated television was on and displaying media from the reported content source. (*Id.*)

26.    The Patents solve this problem by disclosing and claiming innovative ways of determining the likely presentation session data missing from subsets of the tuning session data. (Ex. C, Lee Decl., ¶ 10.) The invention teaches using a second source of data—for example, presentation session data that indicates on/off duration and the display of media from the reported content source—to correct phantom viewing sessions in tuning session data. (*Id.*) For a first subset of the tuning session data, corresponding presentation session data is available. (*Id.*) In other words, in some households, their STB (or other device) reports tuning session data and a meter or some other content tracking source (such as television reporting automatic content recognition ("ACR") data) reports presentation session data. (*Id.*) For this first subset of households, information in the form of presentation session data is available to determine when household members were watching television (*e.g.*, the television was on and displaying media

from the reported content source). (*Id.*) But for a second subset of households, only STB (or other device) tuning data is available, with its previously discussed weaknesses. For this second subset of households, the Patents describe developing a model using data from the first subset of households that allows determining likely presentation session data for the second subset of households, thereby solving the problem of inaccurate tuning data. (*Id.*)

27.    The Patents describe obtaining tuning session data from STBs and similar devices, which report the content to which they are tuned and for how long. (Ex. C, Lee Decl., ¶ 11.) As explained in the Common Specification, a "media presentation device (e.g., STB) provided by a service provider (e.g., a cable television service provider, a satellite television service provider, an over the top service provider, a music service provider, a movie service provider, a streaming media provider, etc.) or purchased by a consumer may contain processing capabilities to monitor, store, and transmit tuning data (e.g., which television channels are tuned on the media presentation device at a particular time) to an audience measurement entity (e.g., The Nielsen Company (US), LLC) to analyze media presentation activity." (Ex. A, '058 Patent, 2:48-57.)

28.    However, tuning session data alone typically does not accurately reflect media consumption in a household. (Ex. C, Lee Decl., ¶ 12.) "The tuning data is based on data received from the media presentation device [*e.g.*, an STB] while the media presentation device is on (e.g., powered on, switched on, and/or tuned to a media channel, streaming, etc.). However, tuning data may include extraneous data that may not accurately reflect media presentation when, for example, the media presentation device is configured to output media via a media output device (e.g., a television), but the media output device is turned off, not receiving the media from the media presentation device, etc. For example, tuning data may include data

related to a STB that outputs television media via a television while the television is off, disconnected, turned to input other than the STB, etc." (Ex. A, '058 Patent, 2:58-3:3.)

29.    The Patents provide an example of collecting presentation session data using a meter (or local people meter ("LPM")), which provides more accurate data about media consumption: "An audience measurement entity typically monitors media presentation activity (e.g., viewing, listening, etc.) of the panelist members via audience measurement system(s), such as a metering device(s) and/or a local people meter (LPM)." (Ex. A, '058 Patent, 3:23-27.) The collected information can include "a number of minutes a household media presentation device was tuned to a particular channel, a number of minutes a household media presentation device was used (e.g., consumed) by a household panelist member and/or a visitor (e.g., a presentation session), demographics of the audience (which may be statistically projected based on the panelist data), information indicative of when the media presentation device is on or off, and/or information indicative of interactions with the media presentation device (e.g., channel changes, station changes, volume changes, etc.)." (Ex. A, '058 Patent, 3:57-67.) This information is more accurate than tuning data because the data from the meter excludes times when the television is off or displaying content from another content source. (Ex. C, Lee Decl., ¶ 13.) But as the Patents explain, only tuning session data is available for many households, and that data may contain limited information about whether a television was on or whether it was displaying media from the reported content source. (*Id.*)

30.    The Patents describe an innovative technique for obtaining meaningful, estimated presentation session data for households where no presentation session data is available. (Ex. C, Lee Decl., ¶ 14.) The Patents describe estimating presentation sessions (representing sessions in which the television is on and displaying from the reported content source) for tuning session

data for which no presentation session data (*e.g.*, metering data or ACR data) exists by creating models from households for which both tuning data and presentation session data are available (*Id.*): "In an effort to transform collected tuning data from media presentation devices (e.g., STBs) into media presentation data (e.g., to account for data including when the media output device is off or not used and/or when an audience member is not present), examples disclosed herein estimate presentation data from collected tuning data based on models determined from the metering data received from LPMs." (Ex. A, '058 Patent, 4:4-10.) Specifically, "[t]he data adjuster 120 of the illustrated example generates models to estimate presentation session data for a received tuning session received from the example media presentation devices 108 [for which STB but not metering data is available]. When the example collection facility 114 receives tuning data from the example media presentation devices 108 and/or from a service provider associated with the media presentation devices 108, the example data adjuster 120 estimates and reports presentation session data based on a comparison of the tuning data and the generated models." (Ex. A, '058 Patent, 7:19-28.) "The example data adjuster 120 analyzes the metering data from the example metering storage 118 to create tuning sessions and presentation sessions based on the metering data. The data adjuster 120 determines tuning session(s) based on a period of time between channel changes indicated in the metering data. … After the tuning session(s) and the presentation session(s) are determined, the data adjuster 120 of the illustrated example creates and/or updates a model based on a duration(s) of the tuning session(s)." (Ex. A, '058 Patent, 7:57-8:4.)

31.    Using this model, the Patents describe estimating the presentation sessions for tuning data for which no presentation session data is available (Ex. C, Lee Decl., ¶ 15): "During the media presentation estimation step, the media presentation device 108 collects tuning data

related to which channel a media presentation device 108 is tuned to while the media presentation device 108 is on. As previously described, the tuning data does not include presentation session data." (Ex. A, '058 Patent, 8:6-11.) For a presentation device 108 for which no presentation session data is available, "[t]he example data adjuster 120 uses the models to estimate presentation sessions based on tuning data from the example media presentation device 108. For example, the data adjuster 120 of the illustrated example estimates media presentation session(s) for tuning sessions received from the example media presentation device 108 of the example media presentation location 110 that does not include a device to collect and/or send media presentation data (e.g., media presentation locations that do not include the example LPM 106 to the collection facility 104)." (Ex. A, '058 Patent, 4:41-50.)

32.     The Patents claim specific improvements to a process for creating accurate models of media viewing. (Ex. C, Lee Decl., ¶ 16.) All the Patents' claims require collecting tuning session data (*e.g.*, STB data) and a second source of data (*e.g.*, presentation session data) for media presentation environments where it is available, creating a model using tuning session data and presentation session data when both are available, determining expected presentation session data for media presentation environments where presentation session data is not available, and outputting or presenting the expected presentation session data. The Patents' innovation, reflected in all the claims, is to use a second source of data—data that, for example, incorporates on/off duration and what the television is displaying—to correct phantom viewing sessions in tuning data. (*Id.*)

33.     All the claims of the Patents are directed toward a technical improvement in audience measurement. (Ex. C, Lee Decl., ¶ 17.) These improvements improve computer systems as a whole by using specific models of data analysis to improve the accuracy of tuning

data. All the claims recite creating models for estimating presentation sessions for households where only tuning data is available and using tuning data and presentation session data for households where both are available. As such, all the Patents' claims recite a particular means of estimating presentation sessions, not just the desired result of obtaining missing presentation session data.

34.     The focus of all the claims is to improve technical functionality in audience measurement technology itself, not on economic or other tasks that uses a computer in its ordinary capacity. (Ex. C, Lee Decl., ¶ 18.) The invention improves media measurement technology to increase data accuracy by performing massive data aggregations and computations against tuning data (*e.g.*, big data as discussed previously) as well as to implement the model component of the invention. All the claims therefore recite an improved audience measurement process, system, and method for producing a certain result in a certain way and not solely the result or effect produced. (*Id.*)

35.     The Patents and their claims do not recite processes and systems that can be performed in a human mind. (Ex. C, Lee Decl., ¶ 19.) All the claims recite data analysis and manipulation of tuning data and presentation session data in a manner that cannot be performed in a human mind. (*Id.*)

36.     Prior art systems did not perform the tasks described in the Common Specification and in the '058 and '250 Patent claims. (Ex. C, Lee Decl., ¶ 20.) Prior art systems did not use data from households that provided both tuning data and presentation session data to create models that could be used to estimate presentation sessions for households that did not provide presentation session data. (*Id.*) In contrast to the prior art, this innovation allows use of

the more voluminous tuning data from STBs (and other devices) without sacrificing data quality caused by the known weaknesses of tuning data, as described above. (*Id.*)

37.    Using a second source to create estimated presentation data for tuning data sessions for which presentation data is not otherwise available, as recited in all the claims, is an important improvement over the prior art. (Ex. C, Lee Decl., ¶ 21.) Tuning data, such as STB data, has some advantages that make it useful in audience measurement. Data from sources such as STBs provides media consumption information from a larger number of households. These larger datasets allow research companies to report media consumption at a much more granular level, providing coverage for many more programs, including those with small and diverse audiences that might show no viewers in a smaller dataset. (*Id.*)

38.    But on its own, STB data does not provide accurate audience measurement. (Ex. C, Lee Decl., ¶ 22.) For example, STB data from a cable or satellite STB indicates when an STB was on and when it was tuned to and away from a channel but does not indicate whether the associated television was on or whether the television was displaying the reported content source. STB data does not distinguish between (1) someone actually viewing media content; and (2) the STB being on but the television being off or the STB being on but the television displaying content from another source (such as a DVD player or Blu-Ray player), *i.e.*, "phantom" viewing. (*Id.*)

39.    Before the invention in the Patents, consumers of audience measurement data were hesitant to use tuning data because that data was viewed as skewed and inaccurate for the reasons discussed previously, including the phantom viewing problem. (Ex. C, Lee Decl., ¶ 23.) But these data consumers were also concerned about the limited size of a panel not reflecting all media content sources, especially sources with relatively small viewership, and about the cost of

increasing the panel size to increase the sample size. (*Id.*) The Patents' invention bridges that gap by increasing the accuracy of tuning data using the additional data points available from presentation data, thereby allowing the use of big data and its broader coverage without phantom viewing inaccuracies. (*Id.*)

40.     The claims of the Patents implement this solution to the phantom viewing problem by estimating presentation session data for households that do not provide presentation session data by modeling households that provide both tuning and presentation session data. (Ex. C, Lee Decl., ¶ 24.) The invention of the Patents allows audience measurement companies to obtain the advantages of larger datasets from sources such as STB tuning data while avoiding its disadvantages by using a second set of more comprehensive data. (*Id.*) By modeling STB tuning data and presentation session data from households that provide both, the invention allows correcting raw STB data from households that provide only that data to account for inaccuracies caused, for example, by an STB being on while the television is off or the television displaying content from another source. (*Id.*)

41.     The priority date of the Patents is at least as early as January 29, 2016, which is the filing date of the ultimate parent application from which the Patents are continuations. (*See* Ex. A, '058 Patent, Face; Ex. B, '250 Patent, Face.)

42.     As of the Patents' priority date, it was not well-understood, routine, or conventional among those of skill in the art to model tuning data and presentation session data from households where both are available to estimate presentation session data for households where presentation data is not available, as claimed in all claims of the '058 and '250 Patents. (Ex. C, Lee Decl., ¶ 26; s*ee e.g.*, Ex. A, '058 Patent, Claims 1-23; Ex. B, '250 Patent, Claims 1-23.)

43.     The claims of the '058 and '250 Patents recite a particular way to improve audience measurement. The Patents and all their claims relate tuning data and presentation session data when both are available to create a model that can then be used to generate presentation session data for households where only tuning data is available. (Ex. C, Lee Decl., ¶ 27.) This processing generates useful, more accurate data from tuning data that alone, as described previously, does not necessarily accurately reflect household viewing.

44.     Correcting tuning data could be done in numerous ways other than those recited in the claims of the Patents. (Ex. C, Lee Decl., ¶ 28.) Instead of the claimed innovation, one could estimate viewing times from the tuning data in another way, such as using third-party data. (*Id.*) For example, STB/tuning data could be first matched to demographics obtained from third-party providers such as Experian, and then such demographic information could be used to estimate viewing within a tuning session. Using such data, a system, for example, could estimate that a 50-year-old male might be watching football but not a Hallmark movie, meaning the television was likely on for the former but off for the latter. (*Id.*) And other techniques could also allow determining when during a tuning session someone was watching. (*Id.*) For example, STBs could incorporate a power sensor to determine if the television was on (and therefore using power), which would allow determining when the TV is on but would not indicate when the television is on but presenting content from another source. (*Id.*) By reciting a specific technique for estimating presentation session data, the claims are limited to a specific process for estimating presentation data from models created from households where both tuning data and presentation session data are available and therefore do not preempt approaches that use other techniques. (*Id.*)

45.     Other techniques for estimating presentation data from tuning data, however, have disadvantages compared to the claimed approach. (Ex. C, Lee Decl., ¶ 29.) For example, obtaining demographic data adds additional procedures and potential costs. And using demographic data to estimate viewing is likely less accurate than estimating viewing from models based on tuning and presentation session data from households reporting both. (*Id.*) Continuing the above example, the 50-year-old male might enjoy Hallmark movies but hate football. (*Id.*) In addition, adding features like a power sensor requires the cooperation of equipment manufacturers and providers as well as likely increasing the equipment's cost. (*Id.*) A power sensor also would provide less accurate data than the invention in that data based on a television drawing power would not differentiate when a television is displaying a different content source than reported by the STB (such as a DVD or Blu-ray) or when the television is on but no one is watching. (*Id.*) The claimed approach avoids these problems by more accurately estimating presentation sessions from actual tuning data and presentation session data without increasing hardware cost or requiring other parties' cooperation. (*Id.*)

46.     All the claims of the Patents recite the combination of obtaining tuning session data from all households and presentation session data from households where it is available. The claims then recite creating a model using tuning session data and presentation session data when both are available. The claims then recite determining expected presentation session data for those households where it is missing and then outputting that data. As of the priority date of the Patents, this combination of elements was not well-understood, routine, or conventional in the prior art. (Ex. C, Lee Decl., ¶ 30.)

47.     Moreover, all the claims of the Patents recite a particular way of estimating presentation data from tuning data. (Ex. C, Lee Decl., ¶ 31.) The claims therefore do not preempt

all ways of estimating presentation data. (*Id.*) By incorporating a specific technique for estimating presentation data, the claims are limited to a specific process for estimating presentation data from tuning data and therefore do not preempt approaches that use other techniques. (*Id.*)

48.     As of the Patents' priority date, the claimed technique of determining expected presentation data was not well-understood, routine, or conventional among those of skill in the art. (Ex. C, Lee Decl., ¶ 32.)

## THE INFRINGING APPARATUS AND METHOD

49.     VideoAmp asserts that its platform is "powered by the most trusted, highest quality TV dataset in the industry" and that "VideoAmp's linear TV dataset is one of the largest commingled, deduplicated and enriched Set-Top Box (STB) and Automatic Content Recognition (ACR) television exposure datasets in the industry, across 39M households and 63M devices." (*See* Ex, D, https://videoamp.com/data/; *see also* Ex, E, NBCU Measurement Framework Look Book V1 ("NBCU Measurement Framework"), Feb. 2021, p. 19, available at https://together.nbcuni.com/wp-content/uploads/sites/3/2022/02/NBCU-Measurement-Framework-Look-Book-V1-Feb-2022-1.pdf; *see also* Ex, F, "The Future of TV is Commingled," p. 5, available at https://videoamp.com/library/the-future-of-tv-data-is-commingled-is-yours/ ("Our dedication to privacy-compliant data processing, and ultimately, commingling, was cemented following our acquisition of IronGrid, an industry leader in cleansing and correcting cable and satellite company viewership data.").)

50.     VideoAmp has reportedly said that "[f]or linear data, STB and Smart TV ACR data are commingled and deduplicated from sources including Inscape/Vizio Smart TVs, DISH STBs, TiVo STBs, Frontier STBs, and Comcast STBs." (*See* Ex, G, "Convergent TV

Measurement Guide," CIMM, 2023, p. 58.) "The method of integrating these linear viewership sources such as ACR, STB, and schedule data is an intricate process we've come to know as commingling." (Ex. F, "The Future of TV is Commingled," p. 3.)

51.    VideoAmp licenses multiple ACR data sets, including from Vizio/Inscape Smart TVs. (*See* Ex, H, VideoAmp Commingles ACR & STB Data To Unify TV, video interview with VideoAmp CRO, Michael Parkes (hereafter "Michael Parkes interview"), 2:01-2:07, https://www.beet.tv/2020/04/videoamp-mixes-acr-stb-data-to-unify-tv-buying-parkes.html; Ex, I, "VideoAmp and VIZIO Announce Renewed Partnership," https://videoamp.com/press/videoamp-and-vizio-announce-renewed-partnership/.) VideoAmp claims to offer "a software and data platform … so we now commingle both ACR data from Smart TV manufacturers as well as set-top box data from MVPDs, and we combine that into a unified TV data set. … We can see full TV viewership … across all of those households. We do a lot of corrections and modeling …." (*See* Ex, H, Michael Parkes interview, 0:23-1:25.)

52.    For commingling STB data and ACR data, the VideoAmp Platform purportedly "take[s] multiple raw, disparate sets of viewership, schedule and metadata, some of which may contain conflicting or overlapping information, and combine them to make one accurate, holistic view that answers the question: 'Who is watching what and when, and where are they watching it?' While the process appears straightforward, each step involves complex data science algorithms, processes and programs in order to execute these tasks at the scale and accuracy required." (*See* Ex, D, https://videoamp.com/data/.) Additionally, as part of the VideoAmp Platform's commingling process, "[o]nce the data has been ingested, it's essential that the data is properly scrubbed and cleansed of additional inaccuracies. This process helps to reduce the number of total viewership sessions, while increasing the overall accuracy of the information."

18

(*See* Ex, D, https://videoamp.com/data/.) "The real commingling process begins by joining separate, enriched datasets to form a holistic, unified dataset with enhanced accuracy and completeness." (*Id.*) "We leverage multiple sources of ad exposure data — from STB, Automatic Content Recognition (ACR), Over-The-Top (OTT), commercial airings and TV schedule data — to create a proprietary matching system that identifies ad exposure at the household and device level." (*Id.*)

53.     In its white paper, "The Future of TV is Commingled," VideoAmp explains that "MVPD [Multichannel Video Programming Distributor] providers report viewership any time the set-top-box is turned on, even if the TV is turned off. These sessions are called phantom viewing, and other data sources in the commingling panel must be used to correct this issue." (Ex F, "The Future of TV is Commingled," p. 14.) "STB data, if unadjusted, can overstate actual viewing because STBs capture tuning whether the TV is off or on. STB data may not contain end-times of the consumption event, which then need to be estimated. … Some measurement providers use both STB and ACR data. They may be combined, or one is used to calibrate the other." (*See* Ex, G, "Convergent TV Measurement Guide," CIMM, 2023, p. 68.)

54.     VideoAmp is part of the Coalition for Innovative Media Measurement (CIMM), which is "an effort to accelerate the development of cross-platform measurement standards for the industry." (*See* Ex, J, https://videoamp.com/press/videoamp-joins-the-coalition-for-innovative-media-measurement/.) In 2020, the CIMM released a whitepaper detailing the best practices in combining STB data and ACR data. (*See* Ex, K, "Combining Set Top Box and Smart TV ACR Data, A study in industry best practices" (hereafter "CIMM whitepaper"), https://cimm-us.org/download-our-best-practices-in-combining-smart-tv-acr-and-set-top-box-

data-whitepaper/.) The purpose of the whitepaper was to "creat[e] a recommendation for the optimal approach for building a commingled data set." (Ex. K, CIMM whitepaper, p. 23.)

55.     VideoAmp was one of the companies interviewed for Phase 2 described in the CIMM Whitepaper. (Ex. K, CIMM Whitepaper at 23.) On information and belief, VideoAmp is the only company interviewed for Phase 2 that performs commingling. On information and belief, the description of commingling in the CIMM Whitepaper therefore describes VideoAmp's process for commingling. (*See also* Ex. G, "Convergent TV Measurement Guide," CIMM, 2023, p. 57 ("VideoAmp's proprietary commingling process solves for inaccuracies and gaps in a single data source, like Smart TV or Set-Top-Box alone. VideoAmp commingles Set-Top Box (STB) and Smart TV Automatic Content Recognition (ACR) television exposure datasets, ingesting, cleansing, and enriching to earn the dataset the label of currency-grade.").)

56.     The VideoAmp Platform ingests both Smart TV/ACR data and STB data and, as part of a commingling process, corrects phantom viewing sessions in the STB data. (Ex. D, https://videoamp.com/data/ ("Improves overall confidence in network recognition and mitigates the effects of phantom viewing sessions where cable boxes are left on, while TVs are off.").) The CIMM Whitepaper recommends "[u]s[ing] tuning data from matched homes with both Set Top Box and Smart TV ACR device matches to inform calibration of combined data set, including un-matched homes." (Ex. K, CIMM Whitepaper at 5.) It explains that "[k]ey calibrations made to data sets … [include] Smart TV ACR adjustments to Set Top Box – CTV access/tuning, set-on/set off, on-screen ad exposure." (Ex. K, CIMM Whitepaper at 6.) "The availability of a matched data set, where Set Top Box and Smart TV ACR data is combined at a household level, is an important component of building a commingled data set. That data set can be used to correct for certain limitations known to exist in each data set - e.g., … Set Top Box data needing

a Set On/Set Off model to adjust for homes that leave their Set Top Box on when the TV is off."
(Ex. K, CIMM Whitepaper at 24.) "Stage 4 includes two important steps. The first is calibrating
Smart TV ACR data sets and Set Top Box data sets based on analyses of the overlap Set Top
Box/Smart TV ACR sample. Smart TV ACR data sets can be utilized to build a better model of
set on/set off and capping long viewing sessions, can be used to add precision to Set Top Box's
identification of the actual time that an ad hit a TV screen, and be used to nationalize a data set
and adjust for differences in viewing behaviors in each Set Top Box providers' subscribers." (Ex.
K, CIMM Whitepaper at 35.)

  57. VideoAmp acquired IronGrid in order to "use IronGrid's expertise to process the
unstructured data that comes from set-top boxes." That expertise included the ability to remove
"zombie viewing" from set-top box tuning data.  (*See* Ex. S, Rae Paoletta, "VideoAmp Acquires
a Clean-Up Crew For TV Data," AdExchanger, July 18, 2018.)  In 2019, Omnicom Media Group
selected VideoAmp as their development partner to implement Omni Advanced TV.  Omnicom
Media Group stated that VideoAmp's implementation involves (i) merging common fields
present in STB and ACR TV viewership, (ii) determining overlap of STB and ACR households,
and (iii) informing algorithms that classify zombie viewing in the STB data feeds with ACR
data:



(Ex. T, Jonathan Steur, "All Aboard! A Cross-Agency Mission Toward Cross-Platform Audience-Based Video Planning & Measurement," MediaPost TV & Video Insider Summit, February 25, 2019, p. 11-13.)

58.    "VideoAmp along with a few other companies have had their profile raised as a possible replacement in measuring cross-platform audiences, audience deduplication and determining business outcomes among other attributes." (Ex. L, https://videoamp.com/press/four-questions-for-michael-parkes-president-videoamp/.) "VideoAmp today announced that Horizon Media, the largest U.S. media agency according to Ad Age Data Center 2023, will be utilizing VideoAmp as a currency for the 2023-24 Upfront season." (Ex. M, https://videoamp.com/press/videoamp-announces-alternative-currency-agreement-with-horizon-media/.) Similarly, Dentsu is using VideoAmp to provide a currency for its clients. (Ex. P, https://www.beet.tv/2023/10/dentsus-delta-attracts-advertisers-to-videoamps-currency.html.)

59.    VideoAmp uses an apparatus ("the Infringing Apparatus") and employs a method ("the Infringing Method") as components of its audience measurement products and services that

perform the commingling described above as well as reporting the results of that processing. The Infringing Apparatus includes VideoAmp's computing systems that allow it to collect, to aggregate, and to report data about TV watching. The Infringing Method includes the steps of collecting, compiling, and analyzing the collected data using its computing systems and other computer systems and apparatuses to perform commingling and to report the results of that processing.

60.    VideoAmp's Infringing Apparatus and performance of the Infringing Method allows it to compete with Nielsen and to develop "alternative" currencies.

61.    By making, using, offering to sell, and selling the Infringing Apparatus and performing the Infringing Method, VideoAmp is infringing the '058 Patent and the '250 Patent as further described below, including in the claim charts attached hereto as Exs. N and O, which are hereby incorporated by reference into this Complaint.

62.    By this lawsuit, Nielsen seeks to enjoin VideoAmp from any further unauthorized use of Nielsen's patented technology, and it seeks to recover damages, including lost profits, increased damages, reasonable attorneys' fees, and other such relief as the Court deems just and proper for VideoAmp's violation of federal law.

## COUNT I

## INFRINGEMENT OF THE '058 PATENT

63.    Nielsen repeats and re-alleges paragraphs 1-62 as if fully set forth herein.

64.    VideoAmp has infringed and continues to infringe, literally or under the doctrine of equivalents, at least claims 1-5, 9, 12-19, and 22 of the '058 Patent ("the Asserted '058 Claims") under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United

States, and/or importing into the United States, the Infringing Apparatus and by performing the Infringing Method in the United States.

65.     VideoAmp's activities are without license or permission from Nielsen.

66.     The Infringing Apparatus and the Infringing Method include all elements of the Asserted '058 Claims, either literally or equivalently, as shown in the claim charts incorporated by reference in this Complaint and attached hereto as Ex. N.

67.     VideoAmp has knowledge of the '058 Patent as of the service date of the Complaint, and VideoAmp is willfully and deliberately infringing the '058 Patent at least as of the service date of this Complaint.

68.     Through the conduct alleged above, VideoAmp has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

69.     VideoAmp has also irreparably harmed Nielsen. Unless and until VideoAmp is enjoined by this Court from further infringement of the '058 Patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

## COUNT II

## INFRINGEMENT OF THE '250 PATENT

70.     Nielsen repeats and re-alleges paragraphs 1-69 as if fully set forth herein.

71.     VideoAmp has infringed and continues to infringe, literally or under the doctrine of equivalents, at least claims 1-5, 9, 11, 14-19, and 22 of the '250 Patent ("the Asserted '250 Claims") under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United

States, and/or importing into the United States, the Infringing Apparatus and by performing the Infringing Method in the United States.

72.    VideoAmp's activities are without license or permission from Nielsen.

73.    The Infringing Apparatus and the Infringing Method include all elements of the Asserted '250 Claims, either literally or equivalently, as shown in the claim charts incorporated by reference in this Complaint and attached hereto as Ex. O.

74.    VideoAmp has knowledge of the '250 Patent as of the service date of the Complaint, and VideoAmp is willfully and deliberately infringing the '250 Patent at least as of the service date of this Complaint.

75.    Through the conduct alleged above, VideoAmp has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

76.    VideoAmp has also irreparably harmed Nielsen. Unless and until VideoAmp is enjoined by this Court from further infringement of the '250 Patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Nielsen prays for judgment against Defendant VideoAmp as follows:

A.    A judgment that Defendant has infringed the '058 and '250 Patents;

B.    A judgment that Defendant's infringement of the '058 and '250 Patents is willful;

C.    An order permanently enjoining Defendant and its officers, directors, agents, servants, employees, affiliates, and all others acting in privity or in concert with

them, and their parents, subsidiaries, divisions, successors, and assigns, from

further acts of infringement of the '058 and '250 Patents;

D.      An award of damages adequate to compensate Nielsen for Defendant's

infringement of the '058 and '250 Patents, including increased damages up to

three times the amount found or assessed, together with pre-judgment and post-

judgment interest and costs, under 35 U.S.C. §§ 154(d) and 284.

E.      A judgment that this case is exceptional and an award of Nielsen's reasonable

attorneys' fees, costs, and expenses under 35 U.S.C. § 285; and

F.      An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Steven Yovits
Douglas Lewis
Constantine Koutsoubas
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel: (312) 857-7070

By:  */s/ David E. Moore*
      David E. Moore (#3983)
      Bindu A. Palapura (#5730)
      Andrew L. Brown (#6766)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE  19801
      Tel:  (302) 984-6000
      dmoore@potteranderson.com
      bpalapura@potteranderson.com
      abrown@potteranderson.com

Dated:  January 31, 2024
11301133/14944.00009

*Attorneys for Plaintiff The Nielsen Company (US), LLC*